Okay, the next argued case is number 13-14-12 in Re Geller, Mr. Yerushalmi. Are you ready? Good morning, may it please the court. We're here on a singular question, whether or not the Patent and Trademark Office can ignore the factual record to establish that a trademark is disparaging to a substantial composite of some group. Mr. Yerushalmi, am I correct that your core argument is that you distinguish between Islam, the religion, and Islamization? Yes, Your Honor, indeed. Suppose the board was correct that stop the Islamization of America opposes everything that's Islamic. Would you then concede its disparagement analysis was correct? If that was the meaning taken by a substantial composite of the American Muslim population, or on the other side of that coin, if it was the substantial composite of the consumers who took in that trademark, the answer would be yes. Okay. Where I see you going is that your essays cited by the board in fact show that the mark doesn't oppose all things Islamic. I'm sorry, I didn't understand. Okay. Pardon my – I've got a head cold. As I take it, you say the core of your argument is that the essays cited by the board in support of their decision in fact show that the mark doesn't oppose everything that's Islamic, but rather opposes something different, Islamization. That's certainly true, and that is part of our argument. Then let me go to your essays. Let me start with a third one, because this is what I find interesting, at JA 1075-77. The essay says, Mrs. Geller – I'm quoting from it now – Mrs. Geller said SIOA began its national city-by-city ad campaign in response to bus ads in Florida inviting people to convert to Islam. That's from the essay. Isn't SIOA's national city-by-city ad campaign the, quote, stop the Islamization of America campaign? Not particularly. There's no question that that ad was in part sponsored by the stop the Islamization of America campaign, but the specific ad was an American Freedom Defense Initiative ad. And what's interesting, that article refers to a specific ad that was run in the Detroit area with the smart transit system. The Sixth Circuit… Wait, wait, wait, which ad? You're referring to the article on page 1075? Yes. That article was relating to a specific ad that read, fatwa on your head, leaving Islam. Well, what I'm interested in is that it says in the article, Mrs. Geller said she began that campaign in response to bus ads inviting people to convert to Islam. Isn't Islam, by definition, all things Islamic? No, Your Honor, and that is precisely the point missed by the Patent and Trademark Office. In the record, the question is how American Muslims perceive that mark. Islam. Islamization. No. That's not what I asked you. Let me repeat. Isn't Islam, not Islamization, Islam, by definition, all things Islamic? Well, that certainly is true, but relative to… Go back. Mrs. Geller said, I'm reading again, SIOA began its national campaign in response to bus ads in Florida inviting people to convert to Islam, not to Islamization, to convert to Islam. That is correct. And you agree that Islam is, by definition, all things Islamic. That is correct as far as it goes. But what that ad relates to, that one sentence out of context, doesn't mean anything. The specific ad that it relates to is an ad that dealt with the fact that young women who sought to leave Islam or not be adherent enough were subject to abuse and honor killings. That was the specific purpose of that ad. The Florida ad? Pardon me? The Florida ad inviting people to convert to Islam? No. The response by her advertisement campaign. It's not what someone else does that speaks to the meaning of stop the Islamization of America. It's what the applicants do with that mark in the marketplace. The ad that ran by the applicants. The professed motivation of the applicant doesn't have any application to what the trademark office is? It certainly does. It was a response to a call in advertisements to convert to Islam, but that wasn't the message. That was simply one of the motivating factors that developed the ad campaign. The question is not the motivating factor. The question is what does the ad campaign respond to? Not converting. None of the ads, none of the work by the applicants opposes conversion to Islam. What it did in this case, the ad campaign that began in Miami and the ad campaign that was the subject of this particular article and has been the subject of a Sixth Circuit Court of Appeals decision. Where that court said looking at the ad, this is not about religion. Because if it were about religion, the applicants could have run the transit ad, but it was prevented from running on the basis that it was about political Islam. It was a political statement. All right, but let's get back to the two-part test that you're supposed to be applying here. Because the Sixth Circuit was considering a totally different legal point. What we're talking about here is whether or not under this two-part test, the general public would have a perception of the use of the term that is one that could be disparaging to a large group of a population. Now, you rely on a definition of the term that comes from academics or elite religious leaders. That's not the general public. That's not who we're supposed to be measuring this against, are we? Well, let me correct that slightly, and I think the government actually agrees with us on this. The question is not what the general public understands. The question is what does a substantial composite of the affected group understand that term to mean? And this especially comes into play because we have two dictionary definitions. One, all things Islamic, which, by the way, occurs nowhere in the world. It's certainly not in the record. No one has ever used that in discourse. The only way it's used is exactly the way that my clients have used it. So the substantial composite is of American Muslims. They are the affected group, according to this Patent and Trademark Office. But what do they say? There's no evidence from the Patent and Trademark Office what they say. But if we turn to the congressional record that has been provided as part of the record, where we do have Muslims testifying, and not simply as experts and scholars. They certainly were there for that reason. But they specifically said, Zinur Boran, Turkish-American, said, I'm here both as a scholar, but also to tell you about my childhood moving from Turkey to this country. And how important it was, this was her term, the difference between Islam versus Islamism. Islamism is the ideology that drives Islamization, advocated by Islamists. That's what all of that testimony goes to. Zinur Boran, Muslim-American, Turkish scholar, but a Muslim-American. Professor Mogahed, an Iranian professor from George Washington University, began his discussion, again, in the record, by saying, I want to first tell you about my personal bias as a Muslim. And he goes to a litany of the problems in the Muslim world. And then he says, the one way that we in the Muslim community, in the Muslim world, can get to a more open and democratic society, is to confront this problem of radical Islamist violence. Muslims themselves, time and time again, and it's in the record, state, you're not doing us any good. Supposing we agree with you, and we reverse and require the office to give you a trademark of stop the Islamization of America, who can you sue for trademark infringement? Well, it would depend on the facts. If someone came along and ran an ad, stop the Islamization of America, using my client's logo, then I might have a trademark violation claim. Supposing somebody came along and ran an ad in which they opposed your position, would they always have a First Amendment right of fair use? I would suggest that they probably would. And I'd have to see the context of the actual ad or the statement, but my view would be yes. At page 25 of the opening brief, Geller argues that loyal, patriotic American Muslims would not be disparaged by stop the Islamization of America under the political meaning of Islamization. That's where you were going with your discussion of individual testimony. Surely you agree that a loyal, patriotic American can want to change the law and the Constitution. Would a loyal, patriotic American want to change the U.S. Constitution and U.S. law? Sure. Would that include imposing Sharia? Again, as part of the Islamization process, the doctrine that's being opposed by the trademark and has its use in the marketplace, what Islamization is, as testified to in Congress and is set forth in all the law review articles, that we brought to discuss this point, is the imposition of a theocratic system that removes… Supposing it's only a portion of the theocratic system. Suppose they want to impose, as a number of states do, Sharia in the area of family law. Sharia in there? In the area of family law. Supposing they want a specific subset of that. They want to ban divorce. Could somebody, suppose they wanted to amend the U.S. Constitution to ban divorce as part of Sharia? Would it still be a loyal, patriotic American? Well, he'd be confused. Sharia includes divorce law. Yeah. But assuming that that was that person's intent, that wouldn't be Islamization. Islamization is a very clear agenda, as set out, again, in the record to great detail. Islamization is not simply an aspect. For example, many Muslim countries have family law, as you point out. Some have identity law, whether you're a Muslim or a non-Muslim. But that's not Islamization. Islamization is… That's where I'm going with that question. Tell me about it. Pardon me? Tell me about it. That's the process that's discussed by the scholar who's now a full professor at Karachi University on that whole process of Islamization in Pakistan by General Haque, part of the record. It's the process of Islamization discussed by Ms. Baran and by the Project on Terrorism. It's part of the same record. I was just trying to remember the correct name. And it's also very much a part of a document that was put into the record to show exactly how Muslims understand that term. They don't necessarily agree, and I would suggest most Muslims don't agree, especially in this country. But there was an article published… Don't agree what? To Islamization. In other words, the point of the entire record and the congressional record, the point of the entire factual record here, is that Muslims have asked, Muslims have made the statement that we need to make this distinction. But you keep… Throughout your brief and here in your argument, you have collapsed the test. The first prong of the test asks what the general public would understand the term to mean. All right? And that's the first place the PTO looked. Then they go to the second prong, and they actually went to the second prong, and, you know, being fairly liberal with your argument, by analyzing both terms. And it's at that point they look to whether or not the greater population of the affected group would be… would realize or feel that it was disparaging in connection with the product offered. So you're referring to Islamization, and you want to offer it in connection with efforts to stop terrorism. So isn't the fact that you are equating at least a large portion of the Islamic population, even if you say they are a bad portion of the Islamic population with terrorism, enough to mean that the board's decision was not an unreasonable one? Okay, there's two questions there, so let me try to get to the first one. The standard is what is the meaning of the term without reference to a particular group, whether we call that the general public. There's only one understanding of the term that the Patent and Trademark Office… one source that the Patent and Trademark Office provides, the dictionary. In the dictionary definitions, there are two meanings. One is the general meaning of all things Islamic, and one is the very specific meaning. From there, the court has said, this court and also Henry Boulevard Entertainment, the court, the district court in the Harjo matter have said, when you have these two dictionary definitions, we can't tell. The next part of the layer of the analysis is you go to the affected group to understand how a substantial composite of that group would understand. That's why we continue to come back to the actual evidentiary record, the congressional testimony, the law review articles, the article by Mr. Idris that was published at the Muslim Student Association and the Islamic Society of North America. Both entities discussed at great detail in the record that this is an area where hundreds and thousands of Muslim Americans read their material about what Islamization is. Granted, the only ones who seem to use the term are professionals and Islamists to describe what they're doing. But that's where the substantial… if I could just come back to Judge O'Malley's second question. Whether or not, the question of whether or not Islamists who seek to engage in Islamization would be disparaged is another issue. From our perspective, as we've made clear in our reply brief, to demean or disparage an individual who would tear asunder the constitutional liberties of this country by simply describing the process and saying that's something we oppose, we would suggest it can't be disparaging. To disparage is to lower in rank by every definition. I'm not lowering in rank if I simply describe what they say. And as we also point out in the reply brief… Wait, wait, wait, wait now. Speaking of reading materials, whether they're named or not, in that first essay at 1043-1046, it says, the vast majority of mosques are backed by groups that are linked to the Muslim Brotherhood. To oppose those mosques, I assume that's part of the vast majority that are linked to the Muslim Brotherhood. The essay suggests asking for the mosque reading list. So what you're suggesting is that if a mosque has a reading list of books, that by definition if somebody reads a book about, I'll say I read a book about Soviet military doctrine, does that make me a communist? No, and that's not what the article suggests. The article lists an enormous number of factors. Funding, connections between the imam and the Muslim Brotherhood. But I'm looking at the reading list. Including reading lists, but that isn't a singular factor. No one would suggest it is. That would be… Seems singular to me. When the article lists funding, associations, that's what the article on 1043 discusses. Only one factor of several includes the reading list. But that is also a legitimate approach to understanding what connections that mosque have. And when we come to the question of the mosque and the opposition, which the government makes a big deal out of, the fact is that of all the mosques in the world, of all the mosques in the United States, Stop the Islamization of America has taken a public position on exactly two. And the two mosques that they took a public position on, the Ground Zero Mosque, at the time, the majority of New Yorkers took… That's not true. Pardon me? That's not true. I mean, I assume that you believe this essay speaks for you. And it says the vast majority of mosques in the United States are backed by groups that are linked to the Muslim Brotherhood. Is that not a position? That is a statement of fact that my clients take. But they didn't oppose all mosques. What I said, Your Honor, was there are only two mosques in the entire United States that my client has taken a public position to oppose. Public position opposing in the sense of building a new mosque as opposed to expressing views about the activities of current mosques. That's the fine distinction you're making. A statement about most mosques as a factual statement being aligned in some way with the Muslim Brotherhood… You didn't say most mosques. It says vast majority. Vast majority. Again, this isn't me speaking. I'm speaking on behalf of my client. But even the vast majority as a statement of fact is simply a position taken by my client regarding the empirical evidence that she's seen before her. But what the article does say very carefully is that if you're going to oppose a mosque then you need to find the empirical evidence that in fact it is part of the Islamization agenda. That was the point of the article and that's the point of the facts. She doesn't say in the article that just because they're Muslims we oppose them. And in fact if you go to the article on the Ground Zero Mosques, the article in which it mentions the fact that President Obama had come out publicly in support of the Ground Zero Mosque. In that particular advertisement, and we cite to it in great detail in the opening brief, my client states expressly that we're not talking about opposing mosque or religion. It's not a religious issue. There are hundreds of mosques throughout New York and those are not our concern. That was her statement in the article cited by the government. The record is replete. My client is as careful. In her work, Stop the Islamization of America, as Ms. Baran was in testifying to Congress as a Muslim American scholar, as Professor Magid was testifying as a George Washington professor whose roots were back in Iran. Each and every one of these statements, and if you look through the LexisNexis survey that we conducted of every single law article that mentions the word Islamization. And in context, every one of them speaks to the threat and the danger of Islamization, not just to the host country, be it Muslim or Western, but to the Muslims that live in that community because they desire. Let me ask you something as a practical matter. Whether or not you could survive a defamation claim if a mosque or someone attacks you for use of this term in connection with fighting of terrorism, that's a very different thing than asking for the imprimatur of the United States government for use of your phrasing. So why is it that you feel the need to trademark this term? You think someone else is going to use it? Well, first of all, like any trademark applicant, my client has invested an enormous amount of time and energy in developing that mark. She uses it in context of advertisements across the country. She puts on conferences. She's a published author, books, a blog that's widely viewed. That mark has meaning. And under Section, the Trademark Act, she has a right to trademark, have that registered. But you're proposing to register it solely for services related to understand terrorism. And yet, throughout this conversation, it seems to me that the usage, which is being contemplated, is broad indeed to whatever Islamization might lead to over the years. And with the trademark, which presumably would be limited to the product, the services in your trademark application, but we have this broad concept of Islamization, which I haven't really heard any narrowing of, which doesn't seem to conform with the identified act to which this, I don't know what to call it, slogan is intended to attach as a mark. And that in itself, I think, adds weight to the position of the office in terms of the breadth of what's being proposed to be trademarked. And separate from the aspect of exclusive use, once there's a registered trademark, presumably the exclusive use of this statement of a concept that might take many forms besides terrorism. So where does that leave you in this rejection? We have a narrow proposed usage for this mark, a very broadly stated mark, and I've been listening to this interesting colloquy, terrorism has been mentioned, but not as the use to which this mark is proposed to be put. Your Honor, if I understand the comment and the question correctly, the broadest use or definition of Islamization, which only found in dictionaries, which talks about all things Islamic, is not an issue here because the other definition is the only definition, I mentioned one about a legal, political, and military approach to taking a political society which is based upon representative government and converting it to a theocracy in a word. And where does that take us as far as the proposed limitation to terrorism? I understand your question. All of the record points to the fact that Islamization ultimately includes terrorism. Whether we look at the law review articles or the statements by Mr. Idris or right here by Ms. Buran, again, a Turkish-American scholar at the Hudson Institute testifying before Congress, and she submits, and the record is A549, in a lengthy discussion of why it is important to make the distinction between Islam simply, or Muslims qua Muslims, and Islamization by Islamists seeking Islamist ideology. Now a trademark is an indication of origin. So are you saying that this trademark owner, if it's registered, is now going to be the only entity, the only person in the nation, that can argue these global concepts? Certainly not, Your Honor. Then what's the purpose of the registration? You don't need it to do what you're doing. The trademark application includes very clearly a logo and the initials SIOA and the name Stop the Islamization of America. The logo, I don't see that in our materials, that it's limited to the design. You're right, Your Honor. The particular trademark application in this litigation is simply the name Stop the Islamization of America. But that, as a trademark office, had no problem with that in terms of satisfying the requirements of a unique mark for goods and services in the marketplace. Their only problem with that mark was the idea that Islamization was disparaging. We shall ask the office. They rejected it on grounds that they felt were sufficient. And those were that it was disparaging to American Muslims when in fact we see that it isn't. So what would be the importance of applying for the mark? The importance of applying for the mark would be to protect that expression, Stop the Islamization of America, and as it's used in the goods and services by my client. Okay. Let's hear from the office. Mr. Casa Grande. Thank you, Your Honor. May it please the court. Where I come from, that's pronounced Casa Grand. Which do you prefer? Casa Grande. Thank you. Okay. My opponent has narrowed the turf that I think that we're arguing on here in that he's conceded that the primary definition, if the primary definition of Islam is right, that refers to all things Islam, American Muslims would find that disparaging. So let me just address his definition of Islamization. We would point out that the record is not nearly as clearly defined in separating Islamization from the religion of Islam. And in fact, if you look at some of the articles that the applicant has put into the record, first of all, he concedes that it's really only policy professionals and experts who use this. And I think, I believe he said that in his argument earlier. The second thing is that these articles, some of them acknowledge that Americans don't make, Americans make the association of Islamism with Islam and that even American Muslims don't appreciate the distinction that these policy articles and testimony before Congress are trying to make. I would point to the record that A469 to show that even many Muslims don't differentiate between Islam and Islamism. And one of the articles points out, and I believe he talked about this in his argument, that it's really an aspirational goal to make this clear distinction, to advance the policy goals that these people who are testifying and writing are trying to advance. And one of the articles states, it's essential to help American Muslims understand the difference between Islam and Islamism. Where are you? I'm pointing to the record at A616, Your Honor. So are you saying that they would have to wait until they taught everybody what this term means and the fact that it doesn't have a broader meaning before they could get a mark? The application has to be examined on the record before the office. And the record before the office on this particular application shows that at this time it's really an aspirational goal of these particular authors that are cited in the record. And if you go to the application itself, it basically is trying, the services are to prevent and understand terrorism. And what the office looked at, in addition to the dictionary, was it looked at how the applicants used the mark. And the way they used it, as you pointed out in some of the questions earlier, don't make the clear distinction between Islam, the religion, and Islamization, the social, the political, legal doctrine. But that wasn't the basis for the rejection, or perhaps partially so, but it doesn't really, it was really the basis for the rejection. Well, we believe that the board did in fact look at that. It talked about the root word of Islamization being Islam. It also talked about how, well, at least in the brief that the applicants had filed here, they talked about a theological, political agenda. They talked about it being the religious law of Islam. Well, it talked about the fact that, I asked her opposing counsel about it, Mrs. Geller began her, says her group began its ad campaign in response to bus ads asking people to convert to Islam, not Islamization, but to convert to Islam. And we think that the articles that were published using the mark are another piece of evidence that shows exactly what the mark means, because these articles did not show or draw a clear distinction between the religion of Islam and this political legal doctrine that they've spoken of. The articles talk about, there's one in particular that says it's a mosque manifesto and it urges the investigation of all mosque building plans. And the opening quote to that article, as we have been reminded time after time, after grisly Islamic terrorist plots have been exposed, there is always a mosque. And we think that that shows that they're not making the clear distinction in their use of the mark between the definition they're now trying to hang their hat on. There's another one entitled the 9-11 mosques peace charade. And it notes that Muslims are already conducting daily prayers on this site. Well, that's not a clear distinction between this political legal doctrine and the religion of Islam either. So while these policy professionals may be advocating for a narrower definition, that simply isn't the case as to how they use it now, and it isn't the case that the public perceives it that way now. So, again, I hate to take us back to the legal framework that we're supposed to be operating in. So it's your view that what the board did was at the second prong of the peril analysis, the board looked not just to the proposed use for the mark, but the current use to inform how someone might understand the use in the context of the goods and services that were at issue. We believe the board looked at both, because it looked both at the services that were described in the application, which we're using to prevent and understand terrorism, and also how the exemplars that were in the record of how the mark was actually used by the applicants used the particular mark. So we think that the board looked at both of those things. Right, but you think that there's a disconnect between those two things, between at least the description that was given to the board and the way it actually seems to be playing out in practice. If what you mean by description, you mean by the definition of Islamization, yes, I believe there was a disconnect, because the evidence that they put in for their narrower definition of Islamization, their own evidence does not support that clear distinction between the two. Okay, and there were no declarations from academics or otherwise, or religious individuals who said that the current use that looked to any of these exemplars and said these exemplars tie exactly to the definition that I'm fostering. Do you mean from the perspective of the applicant? Yes, the applicant did not put in declarations that would tie those two things together, did they? I guess I'm not understanding Your Honor's question. In other words, the elites, the academics, the religious elites, that said that this is how we understand the use of this term. None of them went in and said, and these exemplars are being true to this distinction that we're drawing. Oh, no, that's right, Your Honor. There is no evidence of that in the record. What he's trying to do is essentially take the aspirational definitions in those things that he put in the record and use that to inform what he thinks the proper definition of Islamization ought to be. And so the board's obligation is not simply to look at a term and see how someone who would approach something in a pristine way would view that. It's to look at how a broader section of the public or of the affected group would view that term when taken in context. That's right, Your Honor. Well, I assume Mr. Daryl Shamil replied to you saying, well, gee, I've shown the individual who was of Turkish extraction and the individual who was of Iranian extraction, both said they, as individuals, viewed it that way. And I assume the office has an answer to that. Yes. I mean, those are, first of all, the dictionary definitions, I think, are very important because they show that there are two accepted definitions of the term. Second of all, the way the applicants used it themselves, I think, is probably more important than what these individuals who are in academia might want the term to mean because that shows what the applicants are actually advocating as the meaning of the term. Even if they're speaking as non-academics, they're simply speaking as two individuals who are either practicing or not practicing a religion, but have some relation to it. How does that weigh in the context of everyone in the United States? Well, we think that a few anecdotal examples was probably not enough to overcome the fact that several established dictionaries have the two definitions. Two is only a couple. Has to be three at least to be a few. Okay. But we would say that the fact that a few of these people have said these things to try to make that, or that they understand it a particular way, is not enough to overcome the evidence that the dictionaries say there are two known definitions of the mark and to overcome the fact that the applicants actually use it in a sense that doesn't adhere to that distinction. If your honors have no further questions. Thank you, your honors. Thank you, Mr. Casagrande. Do you have three minutes? I'm sorry? Do you have three minutes for rebuttal if there's more that we can understand? The only evidence that we have that Muslim Americans as the affected group, any Muslim Americans, much less a substantial composite, which is the law, have any problem with this is from a single dictionary definition, and it's an inference about that dictionary definition. But we have two, and as a result we have to go to the affected group, and we've shown Muslims, yes, are they scholars, but they don't lose their quality as Muslim Americans because they're scholars. We have law review articles from law students and law professors who are Muslim cited. We have the Idris article published. Is there more than one law review article? 246 cited of that. We took a random sample and we contextualized the word Islamization in them, every tenth article, and we show in there, every article identifies Islamization in exactly the way the applicants do. The only now evidence we're talking about are the articles that speak about my client's efforts. The article that Your Honor mentioned about the ad campaign was a newspaper article. It wasn't an article that my client cited. But you cite it. No, actually the Patent and Trademark Office cited it. It was introduced into the record by the examining attorney, not by us. We didn't put into the record any of my client's blog articles. All of that evidence was put in by the Patent and Trademark Office. But there, there's no indication. You cite it. You cite it before this court as positing the position of your client and saying that it demonstrates that it's only directed to Islamization as a state act and not as a religious belief or act. Not precisely. What we did was respond to their argument that said these three articles that appear on the applicant's blog are evidence that they don't adhere to their definition. We then responded in our reply brief and we responded to the Trademark and Appeal Board's opinion by saying that's not true. These articles do not say that my client opposes all things Islamic, for goodness sakes. It has nothing to do with that. And indeed, the article, and it's at page 15 of our opening brief, one of the main articles that was actually written by my client, not the Washington Times news article, but the actual words of my client. This is my client speaking. This is not about religious liberty. No one has suggested abridging the First Amendment to stop the mosque, the Ground Zero Mosque, and to oppose the Ground Zero Mosque is not to oppose the First Amendment. There are hundreds of mosques in New York, thousands in America. If we're going to use a blunt instrument, the vast majority of which are backed by the Muslim Brotherhood. Again, another issue. That is an empirical statement. It's not a question of whether or not she opposes those mosques. It's simply an empirical statement. And the evidence would suggest, because the vast majority of mosques are literally titled to the North American Islamic Trust, which is a known Brotherhood organization, the ultimate question is if we're going to allow a blunt instrument to be used by the Patent and Trademark Office to say, notwithstanding that every Muslim that's in the record has said that this is a distinction that's important to make for our behalf, that you can read these articles through any window to establish what is the burden. The burden is the Patent and Trademark Office must bring a substantial evidence to establish that it's disparaging. And I would just like to... You say that these essays are cited by the TTAB, but then you say, for example, on page 14, on the first one, nowhere does this essay suggest, even by inference, that all mosques are objectionable. To be kind, I'm skipping, it is to say that the TTAB must not have even read the article to characterize it as supportive of all things Islamic meaning, and so on. So you are relying, you are citing and relying on these essays. We are certainly rebutting it as evidence that it stands for the proposition that they brought. And I would simply conclude, because my time is well past, and I appreciate the court's indulgence, what this court said in Enri Maverty Media, in a similar type of case where there's a lot of angst going on behind the scenes, even if the members of this panel personally find that the mark Black Tail disgustingly scandalous, the legal conclusion that a trademark comprises scandalous matter must derive from the perspective of the substantial composite. There is no substantial composite by the Patent and Trademark Office. No matter how one wants to read those three articles, there is not a single Muslim in the world who has stood up and said, stopping Islamization disparages us or holds us in disrepute. The only evidence in the record, and it's a monopoly, is that Muslim Americans who have spoken to this point have all said, you're not doing us any favors by wiping this distinction into a kind of vague erasure mark. This is an important distinction to make because it allows us, as Muslims who identify with a constitutional republic, to say all of that terrorism over there is not us. That's Islamism. That's Islamization. It is not Islam simply, and it's not Muslims call Muslims. Thank you.